UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
SUSAN K. GAUVEY
U.S. MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
MDD_skgchambers@mdd.uscourts.gov
(410) 962-4953
(410) 962-2985 - Fax

March 30, 2012

Marcia E. Anderson, Esq.
Law Office of Marcia E. Anderson,
P.O. Box 908
Mount Airy, MD 21771

Alex S. Gordon, Esq.
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, MD 21201

> Re:  Wendy Wells Reynolds v. Michael J. Astrue,
>      Commissioner, Social Security, Civil No. SKG-11-559

Dear Counsel:

Plaintiff, Wendy Reynolds, by her attorney, Marcia Anderson, filed this action seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), who denied Plaintiff's claim for Disability Insurance Benefits ("DIB"), also known as Social Security Disability Insurance ("SSDI"), under Title II of the Social Security Act ("the Act"). This case has been referred to the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301.

Currently pending before the Court are cross motions for summary judgment. (ECF  No. 13; ECF No. 14).   For the reasons

1

that follow, the Court hereby DENIES Plaintiff's motion for summary judgment (ECF No. 13), DENIES Defendant's motion for summary judgment (ECF No. 14-1), and REMANDS this case for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSDI and SSI on June 5, 2008, with a protective filing date of April 24, 2008. (R. 179). She alleged a disability onset date of November 1, 2001, due to impairments resulting from degenerative disc disease, congestive heart failure, high blood pressure, weakened immune system and constant infections, fibromyalgia, seizures, debilitating migraine headaches, asthma, depression, complications from having only one kidney, and various other conditions. (R. 183).

Plaintiff's applications for SSDI and SSI were denied at the initial level on October 10, 2008 on the basis that she was not "disabled" as defined by the rules. (R. 64-67, 68-71). Plaintiff's applications for reconsideration of the initial SSI and SSDI denials were likewise denied. (R. 77-78, 75-76). Thereafter, Plaintiff requested and received an administrative hearing to determine disability. (R. 79). The hearing was held on March 18, 2010. (R. 28-59). During the hearing, Plaintiff amended her disability onset date from November 1, 2001 to January 1, 2007. (R. 31-32).

On April 29, 2010, the Administrative Law Judge ("ALJ") issued a partially favorable decision finding that, while Plaintiff became disabled on August 8, 2009, she was not disabled before that date. (R. 7-22). Consistent with that finding, the ALJ concluded that Plaintiff was not disabled at any time before March 31, 2007, the date last insured. (R. 11-22).

On July 1, 2010, the Social Security Administration denied Plaintiff's claim for SSI because she did not meet the non-medical, i.e., financial, requirements for SSI benefits. (ECF No. 13, Ex. 3). Plaintiff never appealed that non-medical determination, and the 60 day deadline to do so has since lapsed.

On June 22, 2010 Plaintiff appealed the ALJ's medical disability determination to the Appeals Council. (R. 6, 260-70). On December 30, 2010, the Appeals Council denied that appeal, making the ALJ's medical determination the final decision of the Commissioner. (R. 1-6). On March 1, 2011, Plaintiff filed this civil action, seeking judicial review of that final decision pursuant to 42 U.S.C. § 405(g). On February 15, 2012, the Court held a motions hearing to discuss several procedural questions. (ECF No. 18).

## II.    FACTUAL BACKGROUND

Plaintiff was born on February 21, 1958, making her 52 years old at the time of the ALJ's decision. (R. 60). She lives in Hagerstown, Maryland with her husband and son. (R. 42-43). Plaintiff graduated from high school and attended some college, but never graduated. (R. 191). Plaintiff used to work as an auto body shop manager, but no longer does. (R. 193). She also worked as a driver and instructor at a martial arts school, but is no longer able to do so. (R. 38, 193). Plaintiff is not currently employed. (R. 32).

### A. **Medical Evidence**

Plaintiff's medical record begins in 1995 when she was first seen by Dr. Tsal N. Wei for cervical disc herniation. (R. 646-680). Dr. Wei prescribed her Demerol, and a year later prescribed Percocet, and in 1998 prescribed Vicodin, Percocet, and Soma. (R. 677-680). Dr. Wei used trigger point injections beginning in 1997 for neck pain. (R. 678).

In 1996 Plaintiff was also seen by Dr. Mohit Bhatnagar complaining of ongoing neck pain since 1986. (R. 612). Plaintiff complained of radicular symptoms and depression and wanted to discuss surgery. (Id.). Plaintiff reported she experienced "excellent relief" from epidural injection, but that the relief was only for two weeks at a time. (R. 617). In April of 1996, Plaintiff had cervical surgery with a three level

4

discectomy and fusion. (R. 610–611). The post-operation medical record reflects that Plaintiff was pain free two weeks after surgery. (R. 610).

On January 2, 2000, Plaintiff was admitted to Washington County Hospital for a drug overdose. (R. 355–372). She was diagnosed with an overdose of Clonazepam, depression, cervical laminectomy, chronic neck pain, hypertension, single kidney since birth, recovering cocaine addict, and acute respiratory failure. (R. 355–360). Emergency Psychiatric Services diagnosed adjustment disorder with depressed mood and a global assessment of functioning ("GAF") of 55.[1] (R. 359).

On February 18, 2003 Plaintiff was admitted to the emergency room at Frederick Memorial Hospital complaining of abdominal pains, abdominal swelling, kidney pains, and agitation. (R. 271–286). Plaintiff was agitated and complained about the medical care she was receiving, which ultimately led to her discharge against medical advice. (Id.).

In May of 2003 Plaintiff was seen for chest pain. (R. 344–352). Plaintiff was diagnosed with chest wall pain and resolved epigastric pain. (Id.).

---

[1] The GAF scale is intended to measure an individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32(4th ed. 2000) [hereinafter DSM-IV].  A GAF score of 51-61 indicates moderate symptoms (such as a  flat affect and circumstantial speech or moderate panic attacks) or moderate difficulty in social, occupational, or school functioning (such as having no friends or being unable to keep a job). Id. at 34.

During much of the relevant period, Plaintiff obtained primary medical care from Richard G. Yeron, M.D. On February 19, 2004, Dr. Yeron examined Plaintiff for flank pain and dysuria. (R. 425). Plaintiff was experiencing a urinary tract infection, allergic rhinitis, chronic back pain, chronic daily headaches, depression, anxiety, gastroesophageal reflux disease ("GERD"), and acute bronchitis. (Id.).

In late February and early March of 2004, Plaintiff continued to receive treatment from Dr. Wei for neck pain radiating to both shoulders. (R. 653).

In November of 2004, Plaintiff was seen in the emergency room of Washington County Hospital for respiratory complaints. (R. 318-332). Plaintiff had a known history of bronchial asthma for the preceding 10 to 15 years. She was diagnosed with acute bronchitis, acute asthma, bipolar disorder, obstructive pulmonary disease secondary to smoking, solitary kidney, chronic neck pain, disc disease, and the doctors suspected GERD. (Id. at 324). Plaintiff was discharged a little over a week later. (Id. at 319).

In April of 2005, Dr. Wei treated Plaintiff for cervical disc herniation with trigger point injections. (R. 646).

On February 16, 2006, Plaintiff was admitted to Washington County Hospital complaining of chest discomfort. (R. 309-317). Plaintiff was diagnosed with acute anxiety, and stress reaction

with probable mild dehydration. Doctors noted she seemed like a "very anxious lady," but was well groomed and dressed. Doctors also remarked that she seemed to be on a lot of pain medication given her size. (R. 310-311). Plaintiff had full range of motion in her neck and no neurological impairments. (R. 310). Plaintiff was discharged, and on February 20, 2006, Dr. Yeron noted that Plaintiff had a brief episode of syncope while in the hospital. (R. 418).

On May 25, 2006, Plaintiff was seen at the Frederick Memorial Hospital complaining of persistent flu like symptoms. (R. 274-275). Plaintiff reported a history of seizure disorder, daily migraines, anxiety and panic disorder, pleurisy, pneumonia, and congestive heart failure. (R. 274). Plaintiff was diagnosed with anemia and general malaise, a feeling of general discomfort or uneasiness. (R. 275).

In November 2006, Plaintiff told Dr. Yeron that she had a kidney infection and had experienced two episodes of back strain during the preceding two weeks. (R. 416). Dr. Yeron diagnosed back pain and urinary tract infection. (Id.).

Two months later, on January 28, 2007, Plaintiff presented to Washington County Hospital to have glass fragments removed from her left foot. (R. 305). She reported that she was very active in karate, but the glass fragments in her foot caused discomfort and precluded her from performing some of her usual

7

routine. (Id.). Plaintiff denied experiencing any sleep disturbance or headaches. (Id.). On physical examination, she was alert, well-oriented, relaxed, and interactive with her examiner. (R. 306). Plaintiff did not have any swollen joints, and her examiner was not able to elicit discomfort with light or deep palpation of Plaintiff's extremities. (Id.). Several small fragments were removed from Plaintiff's foot, and she was advised to return to the hospital for any progressive symptoms. (Id.).

In April 2007, Plaintiff presented to Dr. Yeron with wheezing and a cough. (R. 414).  Dr. Yeron diagnosed acute bronchitis and cervicalgia. (Id.).

Less than one month later, on May 2, 2007, Plaintiff referred herself to the hospital for suicidal ideation. (R. 288). She reported that she was overwhelmed by the stressors in her life. (Id.). Plaintiff explained that she had financial issues, her husband was abusive, and her son had behavior issues. (Id.). She stated that she was not sleeping well, lost 45 pounds during the preceding year, cried daily, felt helpless and hopeless, and had thoughts of shooting herself. (Id.). Plaintiff reported that she did not receive any psychiatric treatment, but she received prescription medications from Dr. Yeron consisting of Vicodin, Soma, Fiorinal with Codeine, Elavil,

Restoril, and Klonopin. (Id.). She reported she has not had any seizures since 1996. (Id.).

On mental status examination, Plaintiff appeared older than her stated age. (R. 288-89). Her speech and thought process were clear, but she was anxious with a congruent affect. (R. 289). Her attention and concentration were "okay," but her insight and judgment were impaired. (Id.). Plaintiff denied current suicidal ideation and requested discharge from the hospital because she was not receiving the level of pain medication she was accustomed to taking. (Id.). Shortly thereafter, however, Plaintiff decided to stay at the hospital and agreed to take antidepressant medication. (Id.). On physical examination, Plaintiff was alert and oriented and appeared comfortable, although her affect was somewhat blunted. (R. 291). Her neck was nontender, she had full motor strength, and no sensory changes were noted. (Id.).

Plaintiff was discharged from the hospital two days later; she declined to make mental health intake appointments. (R. 297). Her discharge diagnoses included depression disorder, not otherwise specified, and polysubstance abuse. (Id.). Plaintiff was assigned a GAF score of 55.[2] (Id.).

---

[2] A GAF score of 51 to 60 indicates moderate symptoms (such as a flat affect and circumstantial speech or moderate panic attacks) or moderate difficulty in social, occupational, or school functioning (such as having no friends or being unable to keep a job). Id. at 34.

Several weeks later, in late May 2007, Plaintiff told Dr. Yeron that she was not suicidal, but she reported that she had a bad marriage, and her son was the only thing that kept her going. (R. 411). She told Dr. Yeron that she had no appetite, she was losing weight, she had numbness in her right leg, and she had a persistent cough. (Id.). Dr. Yeron diagnosed depression, cough, chronic daily headaches, and chronic back pain. (Id.). In June of 2007, Plaintiff complained to Dr. Yeron of fear, anxiety, panic, feeling exhausted, and skipped heartbeats. (R. 408). Dr. Yeron noted that Plaintiff's blood pressure was 160/90; he diagnosed chronic back pain and palpitations. (Id.).

In December 2007, Plaintiff told Dr. Yeron that she was severely depressed. (R. 393). She reported that she had a physical altercation with her husband, who was taken into police custody and charged as a felon. (R. 393–394). She also reported that her husband sold her car and that her house was going to be foreclosed on. (R. 394). Plaintiff told Dr. Yeron that she had considered suicide but did not have a plan; she reported that her antidepressants and pain medications were not working well. (Id.). Dr. Yeron noted that Plaintiff was experiencing cervical muscle spasms with decreased range of motion with lateral rotation. (Id.). Dr. Yeron also referred Plaintiff for psychiatric treatment for severe situational depression. (Id.).

Approximately one month later, on January 23, 2008, Plaintiff presented to Washington County Hospital complaining of dehydration. (R. 553). She also reported abdominal cramps, nausea, vomiting, diarrhea, and myalgias. (Id.). She denied a history of headaches, and she denied experiencing neck pain or stiffness. (Id.). On physical examination, Plaintiff was alert and oriented and had full range of motion in her extremities. (R. 553–554). Her differential diagnoses were acute gastroenteritis and bowel obstruction. (R. 554). Her attending physician also noted that Plaintiff demonstrated drug seeking behavior. (Id.). She was discharged home in good condition. (Id.).

In August 2008, Plaintiff reported to Koduah Peprah, M.D., for an internal medicine consultative examination. (R. 436). On physical examination, Plaintiff was alert and oriented with a normal affect and a normal gait and station. (R. 440). She had insight into her problems, and she did not have any obvious hallucinations or mood disturbance. (Id.). Plaintiff's nerves, sensation, and reflexes were all intact. (Id.). Dr. Peprah assessed degenerative disc disease of the cervical, thorax, and lumbar spine per history; congestive heart failure per history; controlled hypertension; fibromyalgia per history; history of seizure disorder; history of migraines; history of mild intermittent asthma; and depression. (Id.).

11

On September 10, 2008, State agency medical consultant S. K. Najar, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") and opined that she could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk for about 6 hours during an 8-hour workday, and sit for about 6 hours during an 8-hour workday. (R. 444). Dr. Najar opined that Plaintiff could never climb a ladder, rope, or scaffold, but she could occasionally climb ramps and stairs, stoop, and crouch. (R. 445). Dr. Najar opined that Plaintiff could frequently balance, kneel, and crawl. (Id.). Lastly, Dr. Najar opined that Plaintiff needed to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and she needed to avoid all exposure to hazards. (R. 447).

Approximately one week later, Plaintiff reported to Daniel J. Freedenburg, M.D., for a psychiatric consultative evaluation. (R. 451). Dr. Freedenburg noted that Plaintiff did not receive any psychiatric treatment at that time. (R. 452). Plaintiff told Dr. Freedenburg that pain limited her activities, and she had no patience, was easily frustrated, and depended on neighbors. (Id.). Dr. Freedenburg noted that Plaintiff's ability to get along with coworkers in the past was excellent, and Plaintiff reported that she could follow instructions without difficulty. (Id.).

12

On mental status examination, Plaintiff was alert and oriented with a somewhat blunted affect. (R. 453). Her thought process was coherent and goal-directed, but her insight and judgment, particularly in the area of substance abuse, was impaired. (Id.).Dr. Freedenburg noted that Plaintiff also seemed somewhat confused and had to think longer to produce an answer. (Id.). She was not suicidal. (Id.). Dr. Freedenburg's diagnostic impression was poly psychoactive  substance use; he noted that it was not possible to make a primary psychiatric diagnosis at the time. (R. 454). He assigned Plaintiff an overall GAF score of 75-80 and opined that her highest level of functioning remained in the poor to fair range. (R. 453).[3] Dr. Freedenburg noted that Plaintiff was clearly addicted to narcotic analgesia and needed detoxification followed by re-evaluation. (Id.). He opined that Plaintiff had significant problems with memory, attention, and concentration associated with drug use. (R. 453-54).

In October 2008, State agency medical consultant P. Woods, Ph. D., completed a Psychiatric Review Technique Form and assessed Plaintiff's mental RFC. (R. 455-71). Dr. Woods opined that Plaintiff experienced mild restriction in activities of

---

[3] A GAF score of 71 to 80 means that if symptoms are present, they are transient and expectable reactions to psycho-social stressors, such as difficulty concentrating after a family argument. DSM-IV, supra note 1 at 34. A GAF score in this range indicates no more than slight impairment in social, occupational, or school functioning. Id.

daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 465). Dr. Woods opined that Plaintiff experienced one or two repeated episodes of decompensation, each of extended duration. (Id.). With respect to Plaintiff's mental RFC, Dr. Woods opined that she retained the ability to perform work-related tasks from a mental health perspective. (R. 471). He noted that Plaintiff functioned in a generally independent fashion and was capable of completing daily living functions. (Id.). He also noted that Plaintiff managed within a basic routine and appeared to have the ability to interact and relate with others socially.[4] (Id.).

In February 2009, Plaintiff was evaluated by Sharon Reese, a certified registered nurse practitioner who works with Dr. Dino Delaportas. (R. 577). Plaintiff asked to begin taking Fiorinal because Fioricet did not work as well for her, and she also asked for a higher dose of Vicodin. (Id.). Nurse Reese noted that Plaintiff had been out of Clonazepam for a couple of days, and she had experienced a mild and very brief seizure as an adverse reaction to the Clonazepam. (Id.). Plaintiff reported "significant back pain." (Id.). Nurse Reese noted that Dr.

---

[4] In June 2009, G. Dale, Jr., Ed. D., another State agency medical consultant, completed a PRTF form and assessed Plaintiff's mental RFC. (R. 499-515). Consistent with Dr. Woods' opinion, Dr. Dale opined that Plaintiff retained the capacity to perform simple tasks. (R. 515).

Yeron's license was revoked for dispensing pain medication inappropriately; she explained this to Plaintiff and advised her that she would not prescribe the same medications and dosages as Dr. Yeron. (Id.). Nurse Reese diagnosed chronic pain, history of seizure disorder, and migraine headaches. (Id.). She advised Plaintiff to obtain an MRI scan and then consult a pain management specialist. (Id.).

In April 2009, Plaintiff presented to A. J. Rastogi, M.D., a pain management specialist at the Spine Center. (R. 480). She complained of pain located in the midline cervical region, which traveled to toward her low back and down to her ankles and to both arms, ending with numbness and paresthesias in the hand. (Id.). Plaintiff described her pain as severe and constant, and she reported that it was exacerbated by standing, walking, sitting, exercising, and lying down. (Id.). On physical examination, Plaintiff had decreased range of motion of the neck with severely limited flexion, extension, lateral rotation, and bending. (R. 482). However, she had full strength in her upper and lower extremities, negative straight leg raising bilaterally, and a normal gait. (Id.).

Dr. Rastogi noted that an MRI of Plaintiff's cervical spine showed spinal stenosis at C3-4 with mild narrowing of the C2-3 canal and extensive fusion in the middle cervical levels with mild narrowing of the C6-7 canal secondary to bone graft. (Id.).

15

No definite cord compression or displacement was identified. (Id.). Dr. Rastogi noted that an MRI scan of Plaintiff's lumbar spine did not show any significant abnormality. (Id.). He observed that Plaintiff's diagnostic images, physical examination findings, and clinical presentation correlated with cervical spinal stenosis[5] and radiculitis.[6] (Id.). Dr. Rastogi noted that there may also be a joint disease which contributes to Plaintiff's pain. (Id.). He advised that Plaintiff could benefit from muscle relaxation through the medication Soma, and he noted that she was an appropriate candidate for diagnostic medial branch nerve injections. (R. 483). One week later, Plaintiff reported 50% pain relief following a medial branch nerve injection at C3-6. (R. 479).

In May 2009, Plaintiff reported to William Gene Miller, Ph. D., for a psychological consultative evaluation. (R. 492). Dr. Miller observed that Plaintiff was cooperative, but seemed confused and presented as very sad. (Id.). He noted that Plaintiff was a poor historian, had poor memory functions and poor concentration, was easily distracted, and had poor judgment and reduced insight. (Id.). Dr. Miller's diagnostic impression included alcohol abuse; rule out alcohol-related disorder;

---

[5] Stenosis is "an abnormal narrowing of a duct or canal." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1795 (31st ed. 2007).

[6] Radiculitis refers to "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Id. at 1595.

16

cocaine abuse by history; other substance abuse by history; nicotine dependence; depressive disorder not otherwise specified; and bipolar disorder, not otherwise specified. (R. 494). He recommended that Plaintiff participate in a detoxification program under medical supervision and then have her memory and concentration evaluated. (R. 493).

On June 1, 2009, Plaintiff saw Susan Taylor, another certified registered nurse practioner who works in Dr. Dino Delaportas' office. (R. 574–576). Plaintiff was suffering from a terrible kidney infection and had blood in the urine. (R. 576).

On June 18, 2009, Plaintiff returned to the Spine Center and reported increased pain, the worst of which was concentrated in her neck and upper extremities. (R. 593). She reported that a fentanyl patch was not helpful in relieving her pain, and she noted a diminished benefit from medications. (Id.). Plaintiff also reported that she had not derived significant benefit from the medial branch nerve injection she previously received. (R. 594). Steven I. Sloan, M.D., increased the strength of Plaintiff's fentanyl patch and advised her to apply a second patch if her pain persisted. (Id.). Dr. Sloan also administered a cervical epidural steroid injection. (R. 595).

On August 8, 2009, Plaintiff's husband brought her to the emergency room for ankle pain and a facial rash; he reported that Plaintiff had also made suicidal comments. (R. 546). On

17

mental status examination, Plaintiff was alert, oriented, and cooperative with a depressed mood and tearful affect. (R. 548). She had increased anxiety and slurred speech, but she had a coherent thought process without psychosis, and she denied current suicidal ideation. (Id.). Plaintiff was medically cleared and discharged home with recommendations to seek outpatient mental health services. (R. 549).

Three days later, Plaintiff self-referred herself to the emergency room for suicidal ideation without a plan, and ongoing depression. (R. 528). She presented with slurred speech and was intoxicated from substances. (R. 530). It was noted that Plaintiff had been on a great deal of pain medications and apparently became over-medicated. (Id.). That same day, Plaintiff was transferred to Brook Lane Health Services. (R. 534). Her admission diagnoses were major depression, recurrent, severe, without psychotic features and cocaine dependence by history. (R. 561). She was assigned a GAF score of 30 upon admission.[7] (Id.). Plaintiff was admitted to the mental health unit and participated in individual, group, and milieu therapy. (R. 561-562). During her hospitalization, Plaintiff showed gradual improvement and her suicidal ideation diminished. (Id.).

---

[7] A GAF score of 21 to 30 indicates that the individual's behavior is considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment, or the individual is unable to function in almost all areas. DSM-IV, supra note 1 at 34.

She was discharged six days later, on August 17, 2009, in a reportedly good mood with a full range of affect. (Id.). Upon discharge, Plaintiff was assigned a GAF score of 60.[8] On August 27, 2009, Plaintiff saw Sharon Reese to follow up after her hospitalization. (R. 569).

In September 2009, Plaintiff returned to the Spine Center and told Dr. Sloan that she had begun to experience pain throughout her body and lower extremities. (R. 588). On physical examination, Plaintiff was diffusely tender throughout the thorax and her extremities, and she had positive fibromyalgia trigger points. (R. 589). Dr. Sloan opined that Plaintiff may have been experiencing postlaminectomy syndrome with diffuse myofascial pain or fibromyalgia, but he suspected that a psychological overlay or sleep disturbance amplified her pain. (Id.). Dr. Sloan noted that Plaintiff had failed interventional management, and he noted that she may eventually need to consult a counselor about improving her coping skills to address her pain issues. (Id.).

B. **Testimonial Evidence**

1. **Disability Reports**

---

[8] A GAF score of 60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or difficulty in social, occupational, or school functioning, such as few friends, or conflicts with peers or co-workers. DSM-IV, supra note 1 at 34.

Plaintiff filed an initial adult disability report on June 6, 2008. (R. 182-192). Plaintiff stated she could not work due to her disabilities, including degenerative disc disease, congestive heart failure, high blood pressure, a weakened immune system, fibromyalgia, seizures, debilitating migraines, asthma, depression, various other related conditions, one kidney, and infections. (R. 183). She reported she could not sit too long, or stand too long, and that she took a lot of medications which made her sleepy, sluggish, and forgetful. (Id.).

Plaintiff filed a reconsideration disability appeal report on March 12, 2009. (R. 216-222). Plaintiff states she had constant pain that "becomes worse if I overdo anything," even with medication. (R. 217). Plaintiff reported that her primary physician had lost his license and that she was having a difficult time finding a new doctor. (R. 221).

Plaintiff filed another disability appeal report on August 21, 2009 after requesting a hearing before an ALJ. (R.234-242). Plaintiff stated her severe pain had worsened, and she was now receiving injections for neck and back pain in addition to using a back brace and TENS Unit. (R. 235). Plaintiff stated her concentration and memory were worse and described an ongoing kidney infection. (R. 235). Lastly, Plaintiff noted that she could not afford to pay for all her medical treatment. (Id.).

**2. Function Reports**

Plaintiff completed two adult function reports, one dated August 7, 2008 and another dated April 30, 2009. (R. 205-212, 223-230). In the initial report, Plaintiff noted her impairments affected the following abilities: (1) lifting; (2) squatting; (3) bending; (4) standing; (5) reaching; (6) walking; (7) sitting; (8) kneeling; (9) talking; (10) hearing; (11) stair climbing; (12) memory; (13) completing tasks; (14) concentration; (15) understanding; (16) following instructions; (17) using hands; and (18) getting along with others. (R. 210). Plaintiff states she cooks, cleans, and does laundry for her family. (R. 206). Her son helps her carry the laundry around the house, and she can only prepare simple foods. (R. 206-207). She reported that certain clothing or shoes can be painful to wear, and that she can only shower, not bathe. (R. 206). She stated she could no longer play sports. (R. 209). She reported she often fell after sitting because her right leg went numb. (R.206).

In the report dated April 30, 2009, Plaintiff noted her impairments affected the following abilities: (1) lifting; (2) squatting; (3) bending; (4) standing; (5) reaching; (6) walking; (7) sitting; (8) kneeling; (9) talking; (10) hearing; (11) stair climbing; (12) memory; (13) completing tasks; (14) concentration; (15) understanding; (16) following instructions; (17) using hands; and (18) getting along with others. (R. 228).

Plaintiff's daily routine is hampered by severe pain. (R. 223, 230). Plaintiff reported she could only complete simple household and yard work and that her husband and son helped out a lot. (R. 225-226). Plaintiff stated her husband does all the shopping. (R. 226). Plaintiff reported that she was fired from her job at the auto body shops due to personal reasons, rather than professional ineptitude. (R. 229). Plaintiff also stated that she could lift no more than 5 to 10 pounds. (R. 228).

### 3. **ALJ Hearing**

The ALJ held a hearing on March 18, 2010. (R. 28-59).  Both Plaintiff, represented by Alan Nuta, and vocational expert ("VE") Kathleen Sampeck, testified at the hearing. (R. 28).

Plaintiff testified that her back pain is her most significant problem. (R. 34). Despite using a brace, a TENS Unit, and receiving steroid injections she still experienced pain. (R. 35-36). Plaintiff has not yet been recommended for back surgery, (R. 36), but has received surgery for her neck pain. (R. 39). She testified that she experienced migraine headaches that would debilitate her for three to four days, three to four times a month. (R. 45). She stated further that she had been previously hospitalized for psychiatric reasons and infections. (R. 47). She explained that she has suicidal thoughts and memory loss. (R. 49). She noted that she was born with one kidney and had a history of drug abuse. (Id.).

Plaintiff also testified that the side effects of her medications to treat these ailments cause short term memory loss, dry mouth, headaches, and upset stomach. (R. 39).

Plaintiff testified that she stopped working as an auto body shop manager because she was physically unable to perform the work and was too busy with family life. (R. 53). Plaintiff stated that she last worked in 2008 as a driver and instructor for a martial arts school for children. (R. 32-33). As to her symptoms, Plaintiff said that her pain was unmanageable as of January 2007, and had only gotten worse since then. (R. 37-38). Plaintiff claimed she could not sit for longer than 15 minutes, or stand for more than 15 to 20 minutes. (R. 36). She reported further that she was unable to walk for longer than 10 minutes and could not lift more than 10 pounds. (R. 37). She testified that she had pains in her arms and joints that limited her grasping abilities, such that she would drop a soda can after grasping for a soda can seven to eight times. (R. 41). She claimed that she cannot bend over. (Id.). Finally, Plaintiff testified that she cannot sleep through the night and has to nap during the night, laying down for three to four hour daily. (R. 43-44).

As far as her daily activities, Plaintiff testified that she has a driver's license and drives maybe twice a week. (R. 33-34, 40). She reported that her husband does all the grocery

shopping and pays the bills. (R. 42). Lastly, Plaintiff

testified that she spends most of her time inside her home. (R.

46).

The ALJ asked the VE whether she had enough information to

form an opinion of Plaintiff's capacity to work, and the VE

answered in the affirmative. (R. 52-53). The VE first explained

that Plaintiff's past relevant work as an auto body shop manager

was unskilled, light exertional labor. (R. 53).

The ALJ then asked the VE to consider whether any light or

sedentary jobs exist for an individual with the following

abilities and limitations: (1) lifting no more than 10 pounds;

(2) the need to rise from a seated position four times an hour

for a brief period of time; (3) inability to deal with heights,

steps or hazardous machinery; (4) limitation to unskilled work;

(5) the ability to understand, remember, and carry out only

simple instructions; and (6) the ability to grip and grasp

frequently but not repetitively. (R. 54-55).

In response, the VE opined that such an individual could

perform either light exertional or sedentary exertional work. At

the light level, the VE opined that Plaintiff could work as an

office helper (86,000 job nationally, 1,000 in the state of

Maryland and 1,500 in the state of Virginia), a router (65,000

nationally, 1,000 in Maryland and 2,000 in Virginia), or a

ticket taker (60,000 nationally, 1,200 in Maryland or 1,100 in

Virginia). (R. 55). At the sedentary level, the VE testified that such a person could also be employed as an addresser (42,000 nationally, 3,200 in Maryland, and 3,000 in Virginia), a call-out operator (68,000 nationally, 2,350 in Maryland, 2,600 in Virginia), or a charge account clerk (86,000 nationally, 3,500 in Maryland, 4,600 in Virginia). (R. 55-56). The VE explained that her opinion was based on her experience and the Dictionary of Occupational Titles ("DOT"), but that the DOT does not assess ability to stand up in place, repetitive gripping and grasping. (R. 56). Finally, the VE replied that level 10 pain, laying down three to four hours a day, napping daily from 11 a.m. to 2:00 p.m., debilitating migraine headaches three to four times a month for three to four days at a time, and extended absenteeism resulting in productivity loss would preclude any of the aforementioned jobs. (R. 56-57).

### III.   ALJ'S FINDINGS

In evaluating Plaintiff's claim for supplemental security income, the ALJ was required to consider all of the evidence in the record and to follow the sequential five-step evaluation process for determining disability, set forth in 20 C.F.R § 416.920(a).[9] If the agency can make a disability determination at

---

[9] Disability is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A) (2004).

any point in the sequential analysis, it does not review the claims further. 20 C.F.R. § 1520(a). After proceeding through all five steps, the ALJ in this case concluded that Plaintiff was disabled beginning on August 8, 2009. (R. 22).

The first step requires a plaintiff to prove that she is not engaged in "substantial gainful activity."[10]  20 C.F.R. § 416.920(a)(4)(I).  If the ALJ finds that the plaintiff is engaged in "substantial gainful activity," the plaintiff will not be considered disabled. (Id.). Here, the ALJ determined that, although Plaintiff worked after the amended onset date of January 1, 2007, her part-time work activity did not rise to the level of substantial gainful activity. (R. 12-13).  The ALJ thus continued to the second step of the evaluation process. (Id.).

At the second step, the ALJ must determine whether a plaintiff has a severe, medically determinable impairment or a combination of impairments that limit plaintiff's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c); see also 20 C.F.R. §§ 404.1521, 416.921.  There is also a durational requirement that plaintiff's impairment last or be expected to last for at least 12 months.  20 C.F.R. §

---

[10] Substantial gainful activity is defined as "work activity that is both substantial and gainful."  20 C.F.R. § 416.972.  Work activity is substantial if it involves doing significant physical or mental activities and even if it is part-time or if Plaintiff is doing less, being paid less, or has fewer responsibilities than when he worked before.  20 C.F.R. § 416.972(b). Substantial gainful activity does not include activities such as household tasks, taking care of oneself, social programs, or therapy.  20 C.F.R. § 416.972(c).

416.909.  Here, the ALJ determined that Plaintiff has the
following severe impairments: (1) degenerative disc disease; (2)
stenosis of the cervical spine with a history of an anterior
cervical fusion; (3) a myofascial pain syndrome affecting the
neck and low back with upper and lower extremity radicular pain;
and (4) a major depressive disorder. However, the ALJ concluded
that Plaintiff's congenitally absent left kidney, asthma,
congestive heart failure, migraine headaches, seizure disorder,
and fibromyalgia were not severe. (R. 14).

At step three, the ALJ considers whether Plaintiff's
impairments, either individually or in combination, meet or
equal an impairment enumerated in the "Listing of Impairments"
("LOI") in 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §
416.920(a)(4)(iii). In this case, the ALJ found that neither
Plaintiff's degenerative disc disorder nor her myofascial
syndrome were accompanied by evidence of nerve root compression,
spinal arachnoiditis, or by lumbar spinal stenosis with
pseudoclaudication resulting in an inability to ambulate
effectively so as the meet any provision of section 1.04 of
Appendix 1. (R. 14). The ALJ also found that none of Plaintiff's
physical impairments or combination of physical impairments met
listings. (R. 15).  The ALJ then considered whether Plaintiff's
major depressive disorder met the criteria of listings in 20
C.F.R. Part 404, Subpart P, Appendix 1. (R. 15).  Despite

Plaintiff's limitations due to her mental disorder, the ALJ ultimately determined that Plaintiff's mental impairments failed to satisfy the "paragraph C" criteria. (R. 15)

Before an ALJ advances to the fourth step, he must assess Plaintiff's "residual functional capacity" ("RFC"), which is then used at the fourth and fifth steps.  20 C.F.R. § 404.1520(a)(4)(e).  RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. SSR 96-8p.  The ALJ must consider even those impairments that are not "severe."  20 C.F.R. § 404.1520(a)(2). In determining a Plaintiff's RFC, ALJs evaluate the Plaintiff's subjective symptoms (e.g., allegations of pain) using a two-part test. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); 20 C.F.R. § 404.1529. First, the ALJ must determine whether objective evidence shows the existence of a medical impairment that could reasonably be expected to produce the actual alleged symptoms. 20 C.F.R. § 404.1529(b). Once the claimant makes that threshold showing, the ALJ must evaluate the extent to which the symptoms limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c)(1). At this second stage, the ALJ must consider all the available evidence, including medical history, objective medical evidence, and statements by the claimant. 20 C.F.R. § 404.1529(c). The ALJ must assess the credibility of the

claimant's statements, as symptoms can sometimes manifest at a greater level of severity of impairment than is shown by solely objective medical evidence. SSR 96-7p, 1996 SSR LEXIS 4. To assess credibility, the ALJ should consider factors such as the claimant's daily activities, treatments the claimant has received for the claimant's symptoms, medications, and any other factors contributing to functional limitations. Id.

The ALJ determined that Plaintiff had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b). (R. 15). However, the ALJ placed the following additional limitations on that ability: Plaintiff must be able to rise from a seated position about four times and hour in place for a brief period of time, is limited to lifting no more than ten pounds, can perform frequent, but not repetitive reaching and handling, cannot engage in jobs involving heights, steps, or use of hazardous machinery, is limited to performing unskilled or entry level jobs, and can understand, remember, and carry out only simple instructions. (Id.).

Applying the two-step test for evaluating subjective symptoms, the ALJ found that the evidence and objective medical evidence demonstrated that the "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [those] symptoms

are not credible prior to August 8, 2009, to the extent they are inconsistent with the residual functional capacity assessment." (R. 16).

At the fourth step, the ALJ must consider whether Plaintiff retains the RFC necessary to perform past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The ALJ here determined that Plaintiff is unable to perform her past work as an auto body shop manager. (R. 20).

Where, as here, Plaintiff is unable to resume her past relevant work, the ALJ must proceed to the fifth and final step. This step requires consideration of whether, in light of vocational factors such as age, education, work experience, and RFC, Plaintiff is capable of other work in the national economy. See 20 C.F.R. §§ 404.1520(f), 416.920(f).  At this step, the burden of proof shifts to the agency to establish that Plaintiff retains the RFC to engage in an alternative job which exists in the national economy.  McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).  The agency must prove both Plaintiff's capacity to perform the job and that the job is available.  Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983).  Before the agency may conclude that Plaintiff can perform alternative skilled or semi-skilled work, it must show that Plaintiff possesses skills that are transferable to those alternative positions or that no

such transferable skills are necessary.  McLain, 715 F.2d at
869. Here, the ALJ concluded that, prior to August 8, 2009, the
Plaintiff was capable of performing jobs that existed in
significant numbers in the national economy. (R. 20-21). In so
doing, the ALJ relied on the VE's testimony that given
Plaintiff's exertional and non-exertional limitations, she could
perform light jobs such as an office helper, router, or ticket
taker. (R. 20-21).

Therefore, the ALJ concluded that, while Plaintiff became
disabled on August 8, 2009, she had not been disabled at any
time through March 31, 2007, the date last insured. (R. 22).

## IV.  STANDARD OF REVIEW

The function of this Court on review is to leave the
findings of fact to the agency and to determine upon the whole
record whether the agency's decision is supported by substantial
evidence—not to try Plaintiff's claim de novo.  King v.
Califano, 599 F.2d 597, 598 (4th Cir. 1979). This Court must
uphold the Commissioner's decision if it is supported by
substantial evidence and if the ALJ employed the proper legal
standards. 42 U.S.C. §§ 405(g), 1383(c)(3) (2001); Craig v.
Chater, 76 F.3d 585, 589 (4th Cir. 1996); Coffman v. Bowen, 829
F.2d 514, 517 (4th Cir. 1987). Substantial evidence "consists of
more than a scintilla of evidence but may be somewhat less than
a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th

31

Cir. 1966).  It is "such relevant evidence as a reasonable mind
might accept to support a conclusion." Richardson v. Perales,
402 U.S. 389, 401 (1971) (internal quotations omitted).

In reviewing the decision, this Court will not re-weigh
conflicting evidence, make credibility determinations, or
substitute its judgment for that of the Commissioner. Craig, 76
F.3d at 589; Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.
1990).  The Commissioner, as fact finder, is responsible for
resolving conflicts in the evidence.  Snyder v. Ribicoff, 307
F.2d 518, 520 (4th Cir. 1962).  If the Commissioner's findings
are supported by substantial evidence, this Court is bound to
accept them.  Underwood v. Ribicoff, 298 F.2d 850 (4th Cir.
1962).

Despite deference to the Commissioner's findings of fact, "a
factual finding by the ALJ is not binding if it was reached by
means of an improper standard or misapplication of the law."
Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The Court has
authority under 42 U.S.C. § 405(g) to affirm, modify, or reverse
the decision of the agency "with or without remanding the case
for a rehearing." Melkoyan v. Sullivan, 501 U.S. 89, 98 (1991).

## V. DISCUSSION

Plaintiff raises the following arguments on appeal: (1) the
ALJ improperly recommended that Plaintiff amend her alleged
onset date from November 1, 2007 to January 1, 2007; (2)  the

32

ALJ failed to consider the combined effect of Plaintiff's impairments; (3) the ALJ erroneously determined that Listing 1.104(A) was not met; (4)  the ALJ improperly assessed Plaintiff's strength category; and (5) the ALJ did not rely on substantial evidence  to determine Plaintiff's RFC and disability onset date. (ECF No. 13, 23-24, 32; ECF  No. 16, 12).[11]  After careful evaluation of the record and the opinion of the ALJ as a whole, the Court finds no merit in these arguments.

### A. The ALJ Did Not Improperly Suggest that Plaintiff Change Her Alleged Onset Date

Plaintiff claims that the ALJ improperly encouraged her to amend the onset date of her disability to January 1, 2007. (ECF No. 13, 23). First, the Court fails to see the practical relevance of this argument, as it has no effect on the outcome of Plaintiff's case.  Indeed, Plaintiff was unable to articulate any relevance during the hearing held on February 15, 2012.

In order to receive SSDI benefits[12] Plaintiff must establish that her disability began prior to March 31, 2007, the last date of her insured status.  The dates of January 1, 2007 and November 1, 2001 are both obviously prior to March 31, 2007. Whether the onset date for her entitlement of disability is

---

[11] For clarity and ease of analysis, the Court has rearranged the order of Plaintiff's arguments.

[12] During the motions hearing on February 12, 2012, Plaintiff made clear that, on appeal, she seeks SSDI only (not SSI).

January 1, 2007 or November 1, 2001 has no effect on the amount
of Plaintiff's award.  Retroactive disability benefits can only
be paid for the 12 months preceding the filing of the
application. See 42 U.S.C. §423(b) ("An individual who would
have been entitled to a disability insurance benefit for any
month had he filed application therefor before the end of such
month shall be entitled to such benefit for such month if such
application is filed before the end of the 12th month
immediately succeeding such month."). In sum, if a person was
entitled to benefits but did not file until after they were
entitled, that person is entitled to retroactive benefits, but
only for the 12 months preceding their application date.  See
Ray v. Gardner, 387 F.2d 162, 164 n.4 (4th Cir. 1967) (noting
that an award of benefits may be made retroactive for only
twelve months). The earliest date that plaintiff could receive
payments for SSDI is April 1, 2007. Therefore, whether the onset
date for her period of disability is January 2007 or November
2001 has no effect on plaintiff's award.

Additionally, the Commissioner must consider all evidence
available in a claimant's case record. 42 U.S.C. §423(d)(5)(B).
The change in the onset date does not affect the evidence
reviewed by the Commissioner or the Court.

Nonetheless, the Court notes that the ALJ committed no error
in permitting Plaintiff to amend her alleged onset date. The

34

colloquy between the ALJ and Plaintiff's attorney at the hearing

before the ALJ was as follows:

> ALJ: Okay. Kidney, all right, that gives me
> enough to go on. Treatment records. I've got
> treatment records in, I've got them,
> scattered, basically, from '88 to '06. So
> you want to stay with the alleged onset date
> of November 1, 2001?
>
> ATTY: Well, she, let me see, what's her
> filing date here? Her date of filing is
> April of '08, which means that she'd go
> back, I think, about 17 months. And that's
> all she could get from before then, so we
> could, that would be –
>
> ALJ: Well you want to go back, if you want
> to keep the DIB act, you've got to go back
> to March 31 of '07.
>
> ATTY: Yes, that'd be fine.
>
> ALJ: So you amend to March –
>
> ATTY: Oh, I see what you're saying. Let's go
> before that. January '07.
>
> ALJ: January '07. Okay, that gets her past
> some work history, too.

(R. 31–32). The ALJ did not "persuade" Plaintiff to change the

date, as Plaintiff alleges. Rather, the ALJ raised the issue of

amending the onset date, and Plaintiff's attorney chose to do

so. Nothing improper occurred. See SSR 83-20 (providing that a

claimant may change her alleged onset date through testimony at

a hearing); see also Davis v. Astrue, No. JKS-09-2545, 2010 WL

5237850, at *4 (D. Md. Dec. 16, 2010) (recognizing that "[i]f a

claimant has counsel, an ALJ is 'entitled to rely on the

claimant's counsel to structure and present the claimant's case
in a way that the claimant's claims are adequately explored.'")
(quoting <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167-68 (10th Cir.
1997)).

### B. The ALJ Failed to Properly Consider the Combined Effects of Plaintiff's Impairments

Plaintiff asserts next that the ALJ failed to consider the
combined effect of all of her alleged ailments. (ECF No. 13,
34).  Specifically, Plaintiff argues that the ALJ overlooked her
"bouts with GERD," her "frequent infections," and her "daily
migraine headaches . . . ." (<u>Id.</u>).  Plaintiff's argument is
unavailing with respect to the first two conditions, but does
have merit with respect to Plaintiff's migraine headaches.  The
ALJ's analysis of Plaintiff's headaches was inadequate, and,
based on medical records in evidence, the Court does not find
the error harmless.  The case will be remanded on this account.

To be considered disabled, an applicant must have an
impairment or combination of impairments that significantly
limit their physical or mental ability to do basic work
activities. 20 C.F.R. § 404.1520(c). Therefore, the ALJ was
required to consider the combined, synergistic effect of all of
Plaintiff's medically determinable impairments, severe and non-
severe, to accurately evaluate the extent of their resulting
limitations on Plaintiff. 20 C.F.R. §404.1545(a)(2) ("We will

consider all of your medically determinable impairments of which
we are aware, including your medically determinable impairments
that are not "severe[.]"); Walker v. Bowen, 889 F.2d 47, 49-50
(4th Cir. 1989). However, an ALJ obviously need not explicitly
perform a detailed analysis of every condition a person has ever
had.

First, Plaintiff's "bouts with GERD" appear minor and without
significance in the disability determination. Plaintiff did not
claim that GERD contributed to her disability either in her
disability application or during the hearing before the ALJ.
(See R. 30-58; R. 183; ECF No. 14-1, 2; ECF No. 13, 4).  Any
failure on the ALJ's part to discuss and consider GERD would be
harmless. The Court did find references to GERD in Plaintiff's
medical records, (R. 324 ("#7. – suspect gastroesophageal reflux
disease"), 344 ("mild epigastric pain for which she has taken
Nexium"), 420-422, 425 ("#7 – GERD"), but the record indicates
that the condition was mild, treated on occasion with over the
counter medication.  When GERD is mentioned in the record, the
diagnosis merely appears in a laundry list of conditions. (Id.).
The Plaintiff was never hospitalized for her GERD, and she
offers nothing to suggest that the condition was disabling or
that it could be disabling in combination with her other
symptoms.

Second, the ALJ did acknowledge Plaintiff's "intermittent
urinary tract infections." (R. 14).   The ALJ concluded that
that condition with others were non-severe and only had a
minimal effect on Plaintiff's ability to function. (R. 14).
The record supports that conclusion.   The ALJ did not, however,
explicitly address Plaintiff's other intermittent infections
such as MRSA, facial cellulitis, among others. The record does
reflect some diagnoses of intermittent infections of those
types. (R. 383 ("skin infection" – 6/14/08), 519 ("facial
cellulitis" – 7/9/09)).   However, the ALJ's failure to address
those varieties of infection was harmless because Plaintiff
points to no evidence (and the Court is unable to find any)
showing that the infections were anything more than transient
conditions, amenable to treatment are disabling, whether singly
or in combination with her other conditions.   Accordingly, the
diagnoses of non-UTI infections were few and minor in 2008-2009
time period and she reported several times a history of
"recurrent infections" (R. 441 – 8/26/08) or "weakened immune
system and frequent infections" (R. 437), or "history of
multiple facial MRSA infections" (R. 566 - 8/11/09).   There is
insufficient evidence in the record to support a remand on this
issue.

However, the ALJ's analysis of Plaintiff's migraine headaches
is inadequate.   It is not clear whether Plaintiff in fact

experienced daily headaches, as her counsel claims. (ECF No. 13, 32). Evidence as to frequency is conflicting.  In her application for disability, Plaintiff claimed that "debilitating migraines" limit her ability to work.  (R. 183).  During the hearing on March 8, 2010 Plaintiff stated that she suffers from three different types of headaches: cluster headaches, migraine headaches, and tension/stress headaches.  (R. 45).  Plaintiff testified that she has headaches 3 to 4 times a month, and that the headaches last for 2 to 3 days. (R. 45-46). She testified that, due to the headaches, she is "house-confined" several times per month, for two to three days at a time.  (Id.). However, on several occasions, Plaintiff denied headaches altogether. (R. 321 (On November 28, 2004, Plaintiff reported "[n]o history of . . . headaches"); R. 305 (On January 28, 2007, Plaintiff reported migraines in past but no present symptoms of headache); R. 553 (On January 23, 2008, Plaintiff "denie[d] any history for headache."). At other points, however, Plaintiff did report a history of daily headaches.  (R. 425 (February 19, 2004, Dr. Yeron noted "chronic daily h/a's)); R. 422 (July 20, 2004, Dr. Yeron noted "Chronic daily H/A's"); R. 421 (August 16, 2005, Dr. Yeron noted "chronic Daily H/A¡s"); R. 420 (January 12, 2006, Dr. Yeron noted "chronic – Daily H/A's"); R. 274 (May 25, 2006, doctor noted a past history of "migraines (daily)"); R. 411 (May 30, 2007, Dr. Yeron noted "chronic daily h/a's")).

Notably, most of the latter dates precede Plaintiff's date of last insured (March 31, 2007).[13]  Further, on August 26, 2008, Dr. Peprah noted the following:

> Plaintiff reports that she feels her migraines is [sic] a result of her degenerative disc disease in her neck. She gets about 2 attacks of headaches every week. Patient states that the migraines causes her to have tremendous headach which is associated with visual disturbances.

(R. 437).  The ALJ did acknowledge that Plaintiff "has . . . been prescribed medication for migraine headaches" but concluded that that condition along with other conditions "either singly or in combination" were non-severe and only had a minimal effect on Plaintiff's ability to function. (R. 14). Plaintiff's headaches merited further analysis because Plaintiff specifically listed her migraines as "debilitating" in her disability application, and because medical records, while somewhat conflicting, indicate that Plaintiff may have suffered headaches on a chronic, frequent (several times a week, if not daily) basis at times prior to her date of last insured. Plaintiff explained the types, frequency, and severe effect of her headaches during the hearing.  It is well known that migraine and cluster headaches can be wholly debilitating.

---

[13] Other evidence of headaches in the medical record includes the following: R. 309 (on February 16, 2006, Washington County Hospital noted that Plaintiff "suffers with . . . migraines" and takes "Fiorinal with codeine . . . as needed for headache"); R. 415 (on February 9, 2007, Dr. Yeron noted "migraine h/a"); and R. 392 (on February 8, 2009, Dr. Yeron noted "chronic migraines").

Plaintiff's doctor's credited the severity of her headaches by prescribing, e.g., "Fiorinal with codine." (R. 309). Simply acknowledging that Plaintiff has been prescribed medicine for migraines was insufficient. The case must be remanded on the basis of this error.

**C. The ALJ Did Not Improperly Determine that LOI 1.04(A) Was Not Met**

At step three, the ALJ determined that Plaintiff's spinal conditions failed to meet any provision of listing 1.04, at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. (R. 14). Plaintiff disagrees, asserting that she met or medically equaled Listing 1.04(A). (ECF No. 16, 12-13). Only the following conditions meet listing 1.04(A):

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord[,] [w]ith . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). The plain language of that provision requires claimants to meet all elements listed (_i.e._, the test is conjunctive). Cf. _Sullivan v._

Zebley, 493 U.S. 521, 530 (1990) (a claimant must prove that she meets all of the requirements of a listing). Thus, Plaintiff must prove that she suffers from a spinal disorder, including, *inter alia*, spinal stenosis or degenerative disc disease, and must show evidence of all of the following: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss; (4) sensory or reflex loss; and (if the lower back is involved) (5) a positive straight-leg raising test.[14]

The ALJ acknowledged that Plaintiff suffers from degenerative disc disease and stenosis of the cervical spine. (R. 14). Those conditions are well supported by the evidence. The ALJ also acknowledged Plaintiff's neuro-anatomic distribution of pain and her limitation of motion of the spine, stating that Plaintiff has "a history of an anterior cervical fusion . . . with upper and lower extremity radicular pain," and has a "limited range of motion of her neck and spine." (R. 14–15).

However, there is not substantial evidence that the Plaintiff experienced "motor loss accompanied by sensory or reflex loss" in the neck or spine.  See § 104(A).  Indeed, there is substantial evidence to the contrary. On August 26, 2008 Dr. Peprah explicitly noted on that: (1) Plaintiff "denies any

---

[14] Plaintiff's spinal conditions appear primarily cervical, but because the evidence clearly shows a negative straight-leg test, the Court will include discussion of that element.

weakness[,]" (2) Plaintiff "has normal use of hands and dexterity[,]" and (3) Plaintiff's "[s]ensation . . . and [r]eflexes are intact." (R. 439-40).  He rated Plaintiff's lower extremity muscle weakness at level 5 (indicating "normal strength"). (R. 442).  Dr. Najar's physical RFC is consistent with Dr. Pephrah's findings. Dr. Najar explicitly noted that Plaintiff's "gait is normal and station[,]" and that her "sensation . . . [and] reflexes are intact and there [are] no neurological deficits." (R. 444).  Dr. Najar found no manipulative limitations, and noted that Plaintiff has "normal strength and normal use of hands and dexterity." (R. 448).  On May 2, 2007, Plaintiff was seen admitted to a hospital and on physical examination she had full motor strength and "no sensory changes[.]" (R. 291). On January 24, 2008, Plaintiff was seen at Washington County Hospital and was reported to have full range of motion in her extremities. (R. 554).  On April 16, 2009, Dr. Delaportas, M.D., at the Spine Center assigned Plaintiff "5/5 strength in the upper and lower extremities." (R. 482).  On April 24, 2009, Dr. Robbins, M.D., also found that Plaintiff had "no manipulative limitations." (R. 487).  Finally, on September 24, 2009, Dr. Delaportas, M.D., at the Spine Center explicitly concluded that Plaintiff's "strength/sensation [was] intact in the extremities." (R. 589). Thus, the ALJ was correct to note that "[r]esults of a consultative physical examination did not

reflect any significant impairment of gait, strength, or dexterity . . . ." (R. 18). The record does contain a few instances where Plaintiff complained of numbness.  On May 30, 2007, Plaintiff told Dr. Yeron that her "[right] leg turns numb." (R. 411).  Further, on April 16, 2009, Plaintiff complained to Dr. Rastogi of "numbness and paresthesias in the hand" and "in the upper and lower extremities." (R. 480).  In this case Dr. Rastogi did make a finding of "sensation decreased along the lateral aspect of the deltoid, right greater than left." (R. 482). However, intermittent numbness does not equate to "sensory loss" under the listing. See McDaniels v. Comm'r of Soc. Sec., 136 Fed. Appx. 485, 487 (3d Cir. 2005) ("The listed impairment requires evidence of sensory or reflex loss . . . McDaniels reported only numbness in her left hand, not sensory or reflex loss."); Corbett v. Comm'r of Soc. Sec., 7:08-CV-1248, 2009 WL 5216954 (N.D.N.Y. Dec. 30, 2009) (citing same).

Lastly, Dr. Peprah performed a straight-leg raising test and found that Plaintiff could raise both legs up to 80 degrees, indicating a negative straight-leg test result. (R. 442).

Plaintiff argues that several restrictions imposed by the ALJ in Plaintiff's pre-August 8, 2009 RFC were based on muscle weakness and sensory loss. Specifically, she argues that the ALJ found that Plaintiff's "muscle weakness and sensory loss . . . had limited her ability to reach and handle repetitively and

also completely prevented her from engaging in jobs involving heights, steps, and the use of hazardous machinery." (ECF No. 15, 13). That is an incorrect reading of the RFC. The ALJ concluded that **"[d]ue to [Plaintiff's] cervical disc condition with radiation into her upper extremities**, she could perform frequent, but not repetitive, reaching and handling." (R. 15 (emphasis added)). Likewise, Plaintiff's inability to engage in jobs involving heights, steps and use of hazardous machinery was explicitly due to her **"limited range of motion in her neck and spine.**" (Id. (emphasis added)). As discussed above, the existence of Plaintiff's cervical disc condition with radiation, and the limited range of motion in Plaintiff's neck and spine are not in dispute.

Nevertheless, the evidence does not support a finding that Plaintiff met listing 1.04(A) because she did not experience motor loss, sensory or reflex loss, or have a positive straight-leg raising test.

**D. The ALJ Did Not Improperly Assess Plaintiff's Strength Category in the Pre-August 2009 RFC**

Plaintiff challenges the ALJ's finding that she retained the RFC to perform "light" work subject to certain limitations, arguing that the very RFC limitations set forth by the ALJ necessitate a finding that Plaintiff was limited to "sedentary" work. (ECF No. 13, 33-36). More specifically, Plaintiff

45

asserts that, given the ALJ's RFC finding that "[Plaintiff] was limited to lifting weights of no more than ten pounds," the ALJ was required to categorize Plaintiff's remaining functions as "sedentary" rather than "light." (Id.). In Plaintiff's view, the categorization was determinative of the disability issue because, under the Medical-Vocational Guideline ("MVG") charts (20 C.F.R. Pt. 404, Subpt. P, App. 2), an individual of Plaintiff's age, education and prior work experience who could perform *light* work is considered not disabled, while such an individual who could perform only *sedentary* work is considered disabled. (Id.  at 35).  Plaintiff's arguments lack merit.

First, the 10 pound lifting requirement did not necessitate a classification of Plaintiff's RFC as "sedentary."  Second, and perhaps more importantly, the applicable strength category is not controlling in this case.  These conclusions are discussed in detail below.

Social security regulations classify jobs in one of five strength categories, depending on the physical exertion they require: sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 416.967.  The regulations define light work as follows:

> Light work **involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.** Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most

of the time with some pushing and pulling of
arm or leg controls. To be considered
capable of performing a full or wide range
of light work, you must have the ability to
do substantially all of these activities.

20 C.F.R. § 404.1567(b) (emphasis added).  By contrast, the

regulations define sedentary work as follows:

Sedentary work **involves lifting no more than
10 pounds** at a time and occasionally lifting
or carrying articles like docket files,
ledgers, and small tools.   Although a
sedentary job is defined as one which
involves sitting, a certain amount of
walking and standing is often necessary in
carrying out job duties. Jobs are sedentary
if walking and standing are required
occasionally and other sedentary criteria
are met.

20 C.F.R. § 404.1567(a) (emphasis added).

Strength categories come into play at step five of the

sequential analysis.  At step five, an ALJ determines whether a

plaintiff's RFC permits him/her to find work in the job force

other than his/her past work.  Under certain circumstances, the

MVG charts can be a useful tool in making that determination.

The MVG are broken into separate charts based on strength

category (e.g., Table No. 1 is a sedentary work chart, Table No.

2 is a light work chart, etc.).  See 20 C.F.R. Pt. 404, Subpt.

P, App. 2 .

When a Plaintiff's RFC fits neatly within the definition of

one strength category, an ALJ can simply reference the relevant

chart, and "plug in" the Plaintiff's age, education and work

experience.  Based on those factors, the chart directs a finding of "disabled" or "not disabled."  In a straightforward situation like that, an ALJ need not consult a VE at step five.  See SSR 83-12 (providing that, where Plaintiff has exertional limitations only, "[t]he [MVG charts] . . . direct conclusions of 'Disabled' or 'Not disabled' where all of the individual findings coincide with those of a numbered rule"); SSR 83-14 (explaining that, where Plaintiff has both exertional and non-exertional limitations,  and Plaintiff's "[RFC], age, education, and work experience coincide with the criteria of an exertionally based rule in Table No. 1, 2, or 3[,]" the ALJ can make a disability determination based upon the charts); Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999) (explaining that the MVG charts are only to be used "where they *completely and accurately* represent a claimant's limitations. In other words, a claimant must be able to perform the full range of jobs in a given category, i.e., sedentary work, light work, or medium work").  By contrast, where a Plaintiff's RFC does not align perfectly with a given strength category, the charts are merely to be referenced as a guide, and the ALJ is encouraged to elicit VE testimony to determine whether jobs exist for someone with such an "in-between" RFC, so to speak.  That is especially true where the two strength categories between which the RFC falls would compel different findings as to disability.  See SSR 83-12

48

("The [MVG charts] do not direct [disability] conclusions when an individual's exertional RFC does not coincide with the exertional criteria of any one of the exertional ranges, i.e., sedentary, light, medium, as defined in . . . the regulations[,]" rather, where the strength categories "would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved . . . [and] VS assistance is advisable[.]"); SSR 83-14 ("A particular additional exertional or nonexertional limitation may have very little effect on the range of work remaining that an individual can perform.  The person, therefore, comes very close to meeting a table rule which directs a conclusion of "not disabled."  On the other hand, an additional exertional or nonexertional limitation may substantially reduce a range of work to the extent that an individual is very close to meeting a table rule which directs a conclusion of "Disabled." . . . In more complex situations, the assistance of a vocational resource may be necessary."); Ayala v. Astrue, 2010 U.S. Dist. LEXIS 69467, *15-16 (C.D. Cal. July 12, 2010) ("If a claimant's exertional level falls between two rules which direct opposite conclusions under the [MVG charts], i.e., 'not disabled' at the higher exertional level and 'disabled' at the lower exertional level, and the claimant's

exertional limitations are somewhere 'in the middle' in terms of
the regulatory criteria for exertional ranges of work,
assistance of a vocational specialist . . . , such as a VE, is
advisable.").

In this case, Plaintiff's RFC clearly did not fit into any
one strength category.  Rather, the RFC fell between sedentary
and light work.  By concluding that Plaintiff could perform
light work and not placing exertional limitations on Plaintiff's
ability to stand or walk during the workday, the ALJ clearly
implied that Plaintiff was capable of standing or walking for 6
hours during an 8-hour workday (as is required for "light"
work).  That standing/walking ability far exceeds the exertional
requirement for sedentary work that a person merely *sit* for 6
hours in an 8-hour day.  However, the ALJ placed a non-
exertional limitation on Plaintiff's standing/walking ability:
Plaintiff needs to rise 4 times an hour.  That non-exertional
limitation placed Plaintiff in a category slightly below light.
Further, the exertional limitation on lifting (10 pounds)
seriously compromised Plaintiff's ability to perform a
substantial range of light work, pushing her even closer to the
"sedentary" category.  Plaintiff's argument that the 10 pound
lifting limitation precluded "in-between" classification and
necessarily compelled "sedentary" classification lacks merit.
The Fourth Circuit recognizes a category somewhere between the

full range of light work and sedentary work called a "*reduced range of light work*" or a "*limited* range of light work." <u>See, e.g.</u>, <u>Moore v. Shalala</u>, 1994 U.S. App. LEXIS 29870, *4 (4th Cir. 1994) (finding there was substantial evidence for the finding that the claimant could perform a limited range of light work, even though claimant could lift 10-12 pounds, only sit for an hour, and limited push-and-pull capabilities ); <u>Stacy v. Chater</u>, 1995 U.S. App. LEXIS 32677, *8 (4th Cir. 1995) (finding substantial evidence that claimant was faking their symptoms and could perform a limited but wide range of light work activities). Although the Fourth Circuit has not specifically stated that an exertional limitation in the form of a 10 pound lifting limit can be part of a reduced light range (as opposed to necessitating a sedentary classification), the Sixth Circuit has.  In <u>Reese v. Comm'r of Soc. Sec.</u>, the Sixth Circuit reviewed a case in which Plaintiff "could lift no more than ten pounds," could stand or walk for six hours in an eight hour work day but needed an option to sit for ten minutes every hour, and could not engage in constant repetitive motion or fine manipulation. 2000 U.S. App. LEXIS 23692, *3-4 (6th Cir. 2000). The ALJ in that case explained each of those abilities/limitations to a VE, who determined that jobs existed for a person with those capabilities.  <u>Id.</u> at *4.  The ALJ subsequently concluded that the Plaintiff could perform "light

work." Id.  On appeal, Plaintiff argued that, given the 10 pound

limitation, the ALJ erred in concluding that Plaintiff could

perform light—as opposed to sedentary—work.  Id. at *5.  The

Sixth Circuit rejected this argument, reasoning as follows:

> [Plaintiff's] ability to lift ten pounds on
> occasion, without an express determination
> that she is capable of lifting the maximum
> of twenty pounds, is not determinative of
> this matter. Her ability to walk and stand
> for six out of eight hours in a normal
> workday, coupled with her ability to lift
> ten pound objects with some frequency,
> clearly    support    the    Commissioner's
> conclusion  that  [Plaintiff's]  abilities
> enable her to do "light work" as defined in
> the grids and Regulation 83-10. Counsel has
> not cited this court to any authority, nor
> has   independent   research   yielded   any
> authority,  for  the  proposition  that  the
> absence  of  the  ability  to  lift  twenty
> pounds,    without    more,    automatically
> disqualifies   a   claimant   from   performing
> "light work" where she has the walking and
> standing  ability  possessed  by  [Plaintiff].
> This  latter  ability,  the  primary  difference
> between sedentary and most light jobs, sets
> [Plaintiff] apart from the "sedentary work"
> class of claimants. The appeal lacks merit.

Id. at *7-8; see also Vega v. Astrue, 2011 U.S. Dist. LEXIS

105864, 18-19 (D. Mass. Sept. 19, 2011) (rejecting Plaintiff's

challenge that "the ALJ erred in determining that [she] was

capable of light work because the ALJ's RFC assessment contains

several additional limitations beyond what is required by light

work" including an exertional limitation of "no lifting more

than ten pounds from floor to waist[,]" and holding that "[i]t

is perfectly appropriate for an ALJ to impose additional
limitations on Plaintiff's RFC beyond a simple limitation to
light work, as long as he incorporates those limitations into
his occupational analysis and considers how those limitations
erode the occupational base").[15]

The ALJ recognized that Plaintiff's various exertional and
non-exertional limitations placed her in an "in-between"
category, stating:

> Prior to August 8, 2009, if the claimant had
> the residual functional capacity to perform
> the full range of light work, a finding of
> 'not disabled' would be directed by [the MVG
> charts].  However, the claimant's ability to
> perform all or substantially all of the
> requirements of this level of work was
> impeded by additional limitations.

---

[15] Plaintiff challenges Defendant's reliance on SSR 83-12 for authority that
the ALJ could properly find that Plaintiff could perform a "reduced-range of
light work." (ECF No. 14-1, 32).  Specifically, Defendant cited the following
passage from SSR-12:

> In some instances, an individual can do a little more
> or less than the exertion specified for a particular
> range of work; e.g., the person is considered to be
> physically capable of meeting the exertional demands
> of light work except that he or she can lift no more
> than 15 pounds at a time rather than 20 pounds . . .
> .

Plaintiff is correct that SSR-12 is inapplicable.  That ruling applies "where
an individual has only exertional limitations."  Plaintiff has both
exertional and non-exertional limitations.  However, SSR 83-14 applies to
individuals with both exertional and non-exertional limitations, and that
ruling also supports the idea that exertional limitations (such as lifting)
"can reduce the occupational base of administratively noticed unskilled
sedentary, light, or medium jobs."  SSR 83-14.  Both rulings simply serve to
explain that if an RFC does not fit a strength category exactly, the MVG
charts are merely a starting point for Step 5, and VE testimony is advisable.

(R. 21).  Thus, the ALJ correctly explained that, in order "to determine the extent to which these limitations eroded the unskilled light occupational base," he would need to have a VE determine "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]."  (Id.).  The ALJ did just that.  During the hearing, the ALJ very clearly explained every exertional and non-exertional limitation listed in Plaintiff's pre-August 8, 2009 RFC to a VE. (R. 54).  With respect to exertional limitations, the ALJ explicitly and clearly instructed the VE to consider Plaintiff's ten pound lifting limitation.  (Id.).  In terms of non-exertional abilities and limitations, the ALJ asked the VE to consider the following: Plaintiff's need to rise from a seated position about four times an hour, her ability to perform frequent, but not repetitive, reaching and handling, her inability to engage in jobs involving heights, steps and hazardous machinery, her limitation to unskilled or entry level jobs, and her ability to understand, remember and carry out simple instructions. (R. 54).  In response, the VE listed a number of jobs at both the light work *and sedentary work* levels that, in the VE's opinion, complied with these restrictions. (R. 55-56).

In sum, it was perfectly acceptable for the ALJ to classify Plaintiff's RFC as permitting limited light work rather than

sedentary work; and, in any case, the important issue is not
whether the ALJ's written opinion ultimately classified
Plaintiff's RFC abilities and limitations as light or sedentary—
rather, *the crucial issue is that the ALJ asked the VE to
consider all of Plaintiff's RFC abilities and limitations, and
the VE opined that there are jobs that Plaintiff could perform*.
The Court in <u>Vega</u> summarized these points concisely in the
following way:

> Plaintiff next argues that the ALJ erred in
> determining that Plaintiff was capable of
> performing light work because the ALJ's RFC
> assessment contains several additional
> limitations beyond what is required by light
> work . . . .While it is true that the ALJ
> imposed several additional limitations, both
> exertional (e.g., sit/stand option, *no
> lifting more than ten pounds from floor to
> waist*) and nonexertional (e.g., incidental
> contact with the public and occasional
> contact with coworkers), Plaintiff's
> argument confuses the issue. It is perfectly
> appropriate for an ALJ to impose additional
> limitations on Plaintiff's RFC beyond a
> simple limitation to light work, as long as
> he incorporates those limitations into his
> occupational analysis and considers how
> those limitations erode the occupational
> base. . . . Where an individual's
> exertional RFC does not coincide with the
> definition of any one of the ranges of work
> as defined in sections 404.1567 and 416.967
> of the regulations, the occupational base is
> affected and may or may not represent a
> significant number of jobs in terms of the
> rules directing a conclusion as to
> disability. The adjudicator will consider
> the extent of any erosion of the
> occupational base and access its
> significance. Social Security Ruling

> ("SSR") 83-12, 1983 SSR LEXIS 32. Where it
> is unclear how the additional limitations
> affect the occupational base, the ALJ must
> consult a VE. Here, the ALJ did just that,
> expressly noting in his opinion that he
> questioned the VE about Plaintiff's
> additional limitations . . . . In response
> to this inquiry at the hearing, the VE
> testified that she considered Plaintiff's
> additional limitations in her analysis of
> the occupational base, and ultimately
> concluded that Plaintiff could perform the
> jobs of packer, inspector, and assembler.
> Given that Plaintiff's RFC allowed him to
> perform at least one of these positions, the
> ALJ committed no error.

Vega, 2011 U.S. Dist. LEXIS 105864, *19-20 (D. Mass. Sept. 19,

2011) (emphasis added); see also Baker v. Astrue, 2008 U.S.

Dist. LEXIS 69381 (E.D. Ky. Aug. 27, 2008) (rejecting

Plaintiff's argument that the ALJ's finding of not-disabled was

incorrect as "she was found limited to lifting no more than 10

pounds and, so, could not perform light level work as

erroneously found by the ALJ," reasoning that "the vocational

expert specifically noted that while the jobs he cited did not

require lifting more than ten pounds, they were classified as

light level positions").[16]

---

[16] Plaintiff argues in passing that the ALJ improperly assessed the
credibility of Plaintiff's statements regarding her condition prior to August
8, 2009. (ECF No. 13, 39). An ALJ's credibility analysis is a two-step
process. First, the adjudicator must consider whether there are underlying
medically determinable physical or mental impairments that could reasonably
be expected to produce the individual's pain or other symptoms. Second, if
the underlying physical or mental impairments are shown, the adjudicator must
evaluate the intensity, persistence, and limiting effects of the individual's
ability to do basic work activities. SSR 96-7p; 1996 WL 374186, *2. Here,
the ALJ concluded that even though Plaintiff had medically determinable
impairments that could reasonably be expected to cause the alleged symptoms,

**E. The ALJ Relied On Substantial Evidence**

A Social Security disability claimant bears the burden of supplying adequate records and evidence to prove their claim of disability. 20 C.F.R. § 404.1512(c) and § 416.912(c). However, the SSA is responsible for developing the complete medical history for at least the 12 months preceding filing. (See 20 C.F.R. §§ 416.912(d) through (f)). The Commissioner must consider all evidence available in a claimant's case record. 42 U.S.C. §423(d)(5)(B).

**1. The ALJ Relied on Substantial Evidence to Establish Plaintiff's RFC before August 8, 2009[17]**

Plaintiff claims that the ALJ did not rely on substantial evidence to establish the Plaintiff's RFC before August 8, 2009. The Court disagrees.

In terms of physical impairments, the ALJ accommodated Plaintiff's lower back pain by finding that she needed to be able to rise from a seated position about four times an hour. (R. 15). The ALJ also limited Plaintiff to lifting up to 10 pounds, despite the fact the state examiner reported she could

---

Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible prior to August 8, 2009 to the extent they were inconsistent with the residual functional capacity assessment determined by the ALJ. (R. 16). The ALJ's assessment of Plaintiff's credibility was supported by substantial evidence. The quantum of medical evidence in the record supports a finding that Plaintiff's condition worsened and her pain increased over time. Specifically, after August 8, 2009 Plaintiff's condition had worsened significantly. See infra. Thus, Plaintiff's challenge to the ALJ's credibility assessments lacks merit.
[17] In this case the ALJ made two RFC determinations (pre- and post-August 8, 2009), and Plaintiff only challenges the former, arguing that it is unsubstantiated by substantial evidence.

lift 20 pounds. The ALJ also found that due to her cervical impairment with radiation to her upper extremities, Plaintiff could only perform frequent reaching and handling. (Id.). Lastly, the ALJ accommodated Plaintiff's limited range of motion of the neck and spine by finding that she could not climb steps, work around heights, or use hazardous machinery. (Id.).

As for mental limitations, the ALJ's RFC assessment for the period before August 8, 2009 is consistent with assessments by two State agency medical consultants, both of whom opined that Plaintiff retained the capacity to perform simple tasks. (R. 471, 515). In recognition of Plaintiff's problems with memory, attention, and concentration, the ALJ found that she could only understand, remember, and carry out simple instructions, and she could only perform unskilled or entry-level work. (R. 15).

### 2. The ALJ Relied on Substantial Evidence to Determine Plaintiff's Disability Onset Date

Plaintiff contends that the ALJ's disability onset date of August 8, 2009 was not supported by substantial evidence. (ECF No. 13, 23). Plaintiff explains that her conditions were present long before August 8, 2009 and that nothing new was established on that date. (ECF No. 13, 24, 31). Specifically, Plaintiff argues the medical evidence supports a finding that she was disabled prior to August 8, 2009. (ECF No. 13, 24-32).

### a. Medical Evidence Supports The ALJ's Finding That Plaintiff Was Not Disabled Prior To August 8, 2009

The ALJ carefully considered the medical evidence of record in concluding that Plaintiff was not disabled prior to August 8, 2009. While many of Plaintiff's ailments substantially pre-date the disability onset date, there is substantial evidence that they did not become disabling as defined by 42 U.S.C. § 416(i)(1)(a) until August 8, 2009. Plaintiff is correct in that no new ailments began on that date, but there is medical evidence to support a finding that Plaintiff's combined impairments were disabling only _after_ this date.

The mere diagnosis or existence of impairments is not sufficient to prove onset of disability because symptoms and other manifestations may not become disabling until later on. See Blalock v. Richardson, 483 F.2d 773, 777 (4th Cir. 1972) (holding that the probable existence of symptoms or a condition did not prove onset of disability if the impairments had not reached a disabling stage, especially when the illness is gradual and progressive).

The ALJ acknowledged that Plaintiff's history of cervical degenerative disc disease, congestive heart failure, hypertension, and asthmatic bronchitis all pre-date the amended alleged onset date. (R. 16-17). The ALJ found that the degenerative disc disease, stenosis of the cervical spine with a

history of an anterior cervical fusion, myofascial pain syndrome affecting the neck and low back with upper and lower extremity radicular pain, and major depressive disorder were all severe. (R. 14).  However, as discussed below, the same medical records documenting these ailments indicate that Plaintiff was only moderately affected by them until August 8, 2009.

Before discussing the medical evidence, the Court will address a preliminary matter raised by Plaintiff in connection with her challenge to the ALJ's chosen onset date of August 8, 2009. Specifically, Plaintiff argues that the ALJ attempted to minimize her impairments by stating that "[s]he did not require any hospitalizations or surgery for her physical impairments, did not require the use of an assistive device or brace from her amended alleged onset of disability to August 8, 2009, and required only one brief psychiatric hospitalization (in May 2007) prior to that date." (ECF No. 13, 26; R. 18). Essentially, Plaintiff charges that the ALJ grossly distorts the medical record to Plaintiff's detriment.

First, Plaintiff interprets the phrase "from her amended alleged onset of disability to August 8, 2009" as applying only to the "use of an assistive device or brace," and not the "hospitalizations or surgery for her physical impairments." (ECF No. 13, 26).  In other words, Plaintiff believes the ALJ stated that Plaintiff never required any hospitalizations or surgery

for her physical impairments.   Plaintiff has misread the ALJ
statement.   Her interpretation is undermined by the ALJ's
discussion of Plaintiff's hospitalizations and surgical history
prior to January 1, 2007 elsewhere in his decision. (R. 16, 17).
It is more likely that the ALJ intended to state that Plaintiff
did not require any hospital admissions or surgeries for her
physical impairments *from her amended alleged onset date to
August 8, 2009*, and that statement is supported by the evidence
of record.   The only hospitalizations occurring between January
1, 2007 and August 8, 2009 were either unrelated to Plaintiff's
severe symptoms or were for psychiatric (not physical)
conditions.   For example, on January 28, 2007, Plaintiff
reported to the hospital to have glass fragments removed from
her left foot. (R. 305). These fragments were removed and
Plaintiff was discharged home the same day. (R. 306).   In May
2007, Plaintiff was admitted to the hospital for two days for
suicidal ideation and depression. (R. 288, 297). Although her
discharge diagnoses included seizures, hypertension,
degenerative disc disease, and migraines, Plaintiff was not
admitted to the hospital for these impairments. (R. 297).
Plaintiff reported to the hospital again in January 2008
complaining of dehydration, but she was discharged home in good
condition the same day, and her attending physician noted drug
seeking behavior. (R. 553-54).   In July 2009, Plaintiff reported

to the hospital for facial cellulitis and a urinary tract infection; she was discharged the same day. (R. 518-19).[18]

Secondly, Plaintiff challenges the part of the ALJ's statement regarding mental impairments (that Plaintiff "required only one brief psychiatric hospitalization (in May 2007) prior to [August 8, 2009]"). (ECF No. 13, 27-28).  She references three hospital admissions in support of her argument—one in January 2000, one in November 2004, and the last in May 2007. (Id. at 28).  However, the ALJ did acknowledge the May 2007 hospitalization in his statement ("[Plaintiff] . . . required only one brief psychiatric hospitalization (in May 2007)").  Further, Plaintiff has misrepresented the nature of the former two hospitalizations.  She claims that her 2000 hospitalization was for a "suicide attempt involving an overdose of prescription medication." (ECF No. 13, 27).  However, Plaintiff told medical staff at the time that the overdose was not an intentional overdose and that she was not suicidal. (R. 359).  Likewise, Plaintiff's visit to the Washington County Hospital in 2004 was not for a mental health reason, but for respiratory reasons. Despite the reference to bipolar disorder in her medical

---

[18] Alternatively, Plaintiff challenges the ALJ's statement as to physical hospitalizations/surgeries, even assuming that the ALJ meant that Plaintiff had no hospitalizations or surgeries between January 1, 2007 and August 8, 2009.  (ECF No. 13, 29).  She appears to argue that the latter interpretation indicates that the ALJ did not consider any evidence of physical hospitalizations/surgery prior to January 1, 2007.  Again, that is plainly not true; the ALJ did discuss Plaintiff's hospitalizations and surgical history prior to January 1, 2007. (e.g., R. 16-17).

history, it was not her presenting complaint. (R. 319–321).
Accordingly, the Court rejects Plaintiff's view of the ALJ's
analysis of the medical record.

### b. The ALJ Relied on Substantial Evidence That Plaintiff's Pain Was Not Disabling Until After August 8, 2009

In 1996 Plaintiff visited Dr. Bhatnagar for her ongoing
neck pain. (R. 612). Plaintiff experienced "excellent relief"
from the epidural injection, but the relief was only for two
weeks at a time. (R. 617). Thereafter, Plaintiff had cervical
surgery with a three level discectomy and fusion in April of
1996. (R. 610–611). The post-operation medical record reflects
that Plaintiff was pain free two weeks after surgery. (R. 610).

Notably, during much of the relevant time, Plaintiff's pain
medications were primarily administered by Dr. Yeron, license
number D41717 , who has been subjected to Board action for
improperly dispensing pain medication. His license was summarily
suspended in 2008, which was later changed to a probation on the
condition that he not accept or treat any pain management
patients. See http://www.mbp.state.md.us/bpqapp/ (search under
license number for D41717; then follow "Submit" hyperlink).

In November of 2006, shortly before her amended date of
disability of January 1, 2007, Plaintiff presented to Dr. Yeron
stating that she had experienced two episodes of back strain
during the preceding two weeks. (R. 416). On January 28, 2007,

shortly after her amended alleged onset date, Plaintiff went to Washington County Hospital to have glass fragments removed from her left foot. (R. 305). She reported that she was "very active in karate," but the glass fragments in her foot caused discomfort and precluded her from performing some of her usual routine. (Id.). Plaintiff denied experiencing any sleep disturbance or headaches. (Id.). On physical examination, she was alert, well-oriented, relaxed, and interactive with her examiner. (R. 306). Plaintiff did not have any swollen joints. Plaintiff did not experience pain or discomfort with light or deep palpation of her extremities. (Id.). Thus, both immediately preceding and immediately after her amended alleged onset date, the medical records indicate that Plaintiff's physical condition had not deteriorated to the point that it was disabling.

In May of 2007 Plaintiff referred herself to a hospital for suicidal ideation without a plan and was held overnight. (R. 18, 288). Plaintiff's speech and thought process were clear, and her attention and concentration were adequate, but she had an anxious mood and impaired insight and judgment. (R. 289). On physical examination, Plaintiff appeared comfortable. (R. 291). She was alert and oriented, her neck was nontender, her nerves were intact, and she had full motor strength without sensory changes. (Id.). When Plaintiff was discharged against medical

advice because she claimed she was not receiving her customary pain medication, she was given a GAF score of 55, reflecting only moderate symptoms. (R. 297).

On May 30, 2007 Plaintiff visited Dr. Yeron who diagnosed her with depression and chronic back pain. (R. 411).  Plaintiff returned to Dr. Yeron several months later, in December 2007, complaining that the medications for pain and depression did not seem to be working well. In the patient record Dr. Yeron indicated Plaintiff had recently used a martial arts move on her husband in self-defense, because she practices martial arts. (R. 393–94).

When Plaintiff was admitted to Washington County Hospital on January 23, 2008 for  dehydration she denied a history of headaches and denied experiencing neck pain or stiffness. (R. 553). On physical examination, Plaintiff was alert and oriented and had full range of motion of her extremities. (R. 553–54).

In August 2008, Dr. Koduah Peprah, examined Plaintiff and noted she was alert and oriented with a normal affect and a normal gait and station, despite the fact that Plaintiff told him she had trouble standing, sitting, and walking. (R. 17, 440). Dr. Peprah observed that Plaintiff's nerves, sensation, and reflexes were all intact. (R. 440). The ALJ noted the discrepancy between the doctor's assessment and the Plaintiff's self-assessment noted in the medical record. (R. 18).

On September 10, 2008, State agency medical consultant S. K. Najar, M.D., assessed Plaintiff's physical RFC and reported that she could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk for about 6 hours during an 8-hour workday, and sit for about 6 hours during an 8-hour workday. (R. 444). Dr. Najar reported that Plaintiff could frequently balance, kneel, and crawl. (Id.). One week later Dr. Daniel J. Freedenburg assessed Plaintiff's mental RFC. (R. 451). The ALJ only gave weight to Dr. Freedenburg's objective findings that Plaintiff had problems with memory, attention, and concentration, in accordance with a GAF of 55. (R. 18). This finding is consistent with Plaintiff's admission to the doctor that she could follow instructions without difficulty. (R. 452). As the ALJ noted, it is also consistent with Plaintiff's statements that she could pay bills, handle a checking account, drive short distances, and prepare simple meals prior to August 8, 2009. (R. 18; see R. 207, 208, 225, 226).

In April of 2009, Plaintiff had full strength in her upper and lower extremities, negative straight leg raising bilaterally, and a normal gait. (R. 482). However, Plaintiff had decreased range of motion in her neck and some tenderness to palpitation. (Id.). In June of 2009, Plaintiff presented with increased neck and bilateral upper extremity radicular pain" which she described as "constant burning, aching, shooting, with

numbness in the upper extremities." (R. 593).  Based on the foregoing evidence the ALJ concluded that Plaintiff had the capacity to perform unskilled or entry level jobs prior to August 8, 2009. (R. 18).

Evidence might support a finding that Plaintiff's disability onset date was in June of 2009 because of her documented increased pain at that point in time, but even if that was her onset date, it would not change her entitlement to SSI because it is long after March 31, 2007, her date last insured.

Moreover, the ALJ had substantial evidence for deciding that August 8, 2009 marked the onset of disability: Plaintiff's pain worsened on and after this date. On August 8, 2009, as discussed more fully below, Plaintiff went to the emergency room complaining of ankle pain.  (R. 546).  Plaintiff appeared to be overmedicated for her pain for her degenerative disk disease.

After this date, Plaintiff's pain increased significantly. In Plaintiff's request for a hearing before an ALJ, dated August 21, 2009 (after the onset date determined by the ALJ), Plaintiff reported her severe pain had worsened, and she was now receiving injections for neck and back pain in addition to using a back brace and TENS Unit. (R. 235).

In September 2009, Plaintiff began to experience pain throughout her body and lower extremities. (R. 588). On physical

examination, Plaintiff was diffusely tender throughout the thorax and her extremities, and she had positive fibromyalgia trigger points. (R. 589). Dr. Sloan opined that Plaintiff may have been experiencing postlaminectomy syndrome with diffuse myofascial pain or fibromyalgia, but he suspected that a psychological overlay or sleep disturbance amplified her pain. (Id.). Dr. Sloan noted that Plaintiff had failed interventional management, and he noted that she may need to consult a counselor about improving her coping skills to address her pain issues. (Id.).

In sum, Plaintiff's pain became more extensive after August 8, 2009, spreading over her entire body, as well as more severe, as it became unresponsive to medical interventions.

### c. The ALJ Relied on Substantial Evidence that Plaintiff's Depression was Not Disabling Until after August 8, 2009

At about the same time – August, 2009, Plaintiff's psychiatric condition also deteriorated.  While plaintiff contends that her mental condition was severe and disabling much earlier, there is substantial evidence supporting the August, 2009 onset date in light of the progression of her mental condition.

Plaintiff asserts that her 2000 hospitalization was for a "suicide attempt involving an overdose of prescription medication." (ECF No. 13, 27).  The medical  record does not

reflect this overdose was the result of mental illness or suicidal actions. (R. 355–372). In fact, Plaintiff explicitly told medical examiners that the overdose was not intentional and that she was not suicidal. (R. 359).  Moreover, her GAF score of 55 reflecting only moderate impairments. (R. 359).

On February 16, 2006, Plaintiff was seen at emergency room and diagnosed with acute anxiety and stress reaction with probable mild dehydration. (R. 309–317).

In May of 2007, Plaintiff referred herself to a hospital for suicidal ideation without a plan and was held overnight. (R. 18, 288). Plaintiff's speech and thought process were clear, and her attention and concentration were okay, but she had an anxious mood and impaired insight and judgment. (R. 289). On physical examination, Plaintiff appeared comfortable. (R. 291). When Plaintiff was discharged because she claimed she was not receiving her customary pain medication, she was given a GAF score of 55, reflecting only moderate symptoms. (R. 297).

On August 8, 2009, Plaintiff went to the emergency room for ankle pain and a facial rash.  And during the visit her husband reported suicidal comments.  (R. 546).  In the emergency room she was diagnosed with an ankle sprain, head injury and depression.  (R. 541).  On mental status examination, Plaintiff was cooperative with a depressed mood and tearful affect. (R. 548). She had increased anxiety and slurred speech, but she had

a coherent thought process without psychosis, and she denied current suicidal ideation. (Id.).  As a result of a behavioral assessment, Plaintiff was diagnosed with major depressive disorder and discharged home with recommendations to seek outpatient mental health services. (R. 549).

Three days later, Plaintiff self-referred herself to the emergency room for suicidal ideation, without a plan, and ongoing depression. (R. 528). She presented with slurred speech and was intoxicated from substances. (R. 530). Plaintiff was transferred to Brook Lane Health Services. (R. 534). Upon admission she was diagnosed with major depression that was recurrent and severe, but without psychotic features and cocaine dependence by history. (R. 561). She was assigned a GAF score of 30 upon admission.[19] (Id.). Plaintiff was admitted to the mental health unit and participated in individual, group, and milieu therapy. (R. 561-62). During her hospitalization, Plaintiff showed gradual improvement and her suicidal ideation diminished. (Id.). She was discharged six days later, on August 17, 2009.

After August 8, 2009, Plaintiff's mental condition had deteriorated significantly, demonstrated by her two mental health episodes in early August.

**F. The ALJ Did Not Improperly Fail to Consider Plaintiff's Dependence on Pain Medication**

---

[19] A GAF score of 21 to 30 indicates that the individual is unable to function in almost all areas. Id. at 34.

Plaintiff claims the ALJ improperly failed to consider Plaintiff's dependence on pain medication and the effects of that dependence prior to August 8, 2009.  However, the SSA will only consider the effect of drug or alcohol dependence after a preliminary determination of disability is made. See 20 C.F.R. § 404.1535 (stating the SSA will only consider whether drug addiction or alcoholism was a contributing factor once there is a finding that claimant is disabled); see also 20 C.F.R. § 416.935 (a) (stating the SSA will only consider whether drug addiction or alcoholism was a contributing factor once there is a finding that claimant is disabled).  The ALJ did not need to consider the Plaintiff's alcohol or drug dependence prior to August 8, 2009, because he did not find her disabled prior to that date.

## VI.    CONCLUSION

Ms. Reynolds indisputably has a long history of serious physical and mental difficulties and diagnoses. The ALJ did an admirable job in his review and analysis of her complex history, as evident in the voluminous medical records.[20]  However, he failed to adequately consider Ms. Reynolds' headaches, which she claimed were "debilitating" in her application for disability

---

[20] I also want to acknowledge the exemplary work of my law clerk and my legal intern for their valuable assistance in fully reviewing the parties' arguments and the record in this complex case.

(R. 183), and which medical records dated prior to Ms. Reynolds'
last date of insurance show may have been daily. (R. 425, R.
274). Accordingly, the Court DENIES Plaintiff's motion for
summary judgment (ECF No. 13), DENIES Defendant's motion for
summary judgment (ECF No. 14-1), and REMANDS this case for
further proceedings.  Despite the informal nature of this
letter, it shall constitute an Order of the Court, and the Clerk
is directed to docket it accordingly.

                              Sincerely yours,

                                   /s/

                              Susan K. Gauvey
                              United States Magistrate Judge